No. 25-20486

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

EVAN DOMANIC,

Plaintiff-Appellant

v.

CHRISTIAN BROTHERS AUTOMOTIVE CORPORATION

Defendant-Appellee

_____

On Appeal from the United States District Court
Southern District of Texas
Civil Action No. 4:22-CV-386
Hon. Drew B. Tipton, Presiding

_____

**REPLY BRIEF OF APPELLANT**

_____

Eric L. Grogan
Attorney in Charge
Texas Bar No. 24116461
SD Bar No. 3510118
GROGAN LAW, PLLC
7600 Chevy Chase Dr.
Suite 300
Austin, TX 78752
eric@groganfirm.com
512-534-7970
*Attorney for Appellant Evan Domanic*

1

# I. TABLE OF CONTENTS

*I. TABLE OF CONTENTS*................................................................ *2*

*II.   TABLE OF AUTHORITIES*.................................................... *3*

*III.  STATEMENT OF THE ISSUE PRESENTED FOR REVIEW* ........................... *4*

*IV.  SUMMARY OF THE ARGUMENT* .................................................. *5*

*V.    REPLY ARGUMENT* ........................................................ *6*

*IV. CONCLUSION* ................................................................ *12*

## II. TABLE OF AUTHORITIES

**CASES**

*Boy Scouts v. Dale,* 530 U.S. 640 (2000) ................................................ 11

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171 (2012) ...................................................................................................... 11

*Runyon v. McCrary*, 427 U.S. 160 (1976)............................................... 8

*Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 610 (1987)................. PASSIM

**STATUTES**

*42 U.S.C. § 1981* ..................................................................................... PASSIM

**OTHER AUTHORITIES**

Michael Banton, *Max Weber on 'Ethnic Communities': A Critique*. NATIONS AND NATIONALISM, 13: 19-35 (2007). https://doi.org/10.1111/j.1469-8129.2007.00271.x ..................................................................................... 7

## III.  STATEMENT OF THE ISSUE PRESENTED FOR REVIEW

Appellant appeals summary judgment, as awarded to Appellee, based on the United States District Court Southern District of Texas, Houston Division's finding that there is a discernable and recognizable difference between a religious and ethnic Jew, at least under Section 1981, Title 42, Unites States Code. Appellant argues and maintains that this finding permits Appellee, and other businesses similarly situated, to discriminate against ethnic Jews based on race while asserting the discrimination against Jews is based solely on religious grounds. This finding, as herein described, permits and licenses the exact discrimination that the Congress in 1870 that passed Section 1981 into law was intending to prohibit.

## IV.   SUMMARY OF THE ARGUMENT

Appellant argues that there is no meaningful distinction between his Jewish faith and Jewish ethnicity under 42 U.S.C. §1981. Appellant argues that there is: (1) case-law support for his position that discrimination against Jews, whether it be based on race or religion, is not mutually exclusive under 42 U.S.C. §1981; and (2) that in finding a distinction between Appellant's Jewish ethnicity and Jewish faith, the purpose and protections afforded by the Congress that passed 42 U.S.C. §1981 are immeasurably diminished, defeating the very purpose of the law. Finally, Appellant argues that Appellee's reliance on a ministerial exception in the district court is inapplicable.

## V.   REPLY ARGUMENT

### SECTION 1981 WAS INTENDED TO PROTECT JEWS FROM DISCRIMINATION ON ETHNIC AND RELIGIOUS GROUNDS

Appellee's argument, assuming Appellee understands the argument properly, relies on the premise that because Appellee discriminated against Appellant based on Appellant's religion and not Appellant's race, that Appellant has no claim under 42 U.S.C. §1981. This argument, however, relies upon conceptual distinctions between religion, race, and ethnicity, an admittedly murky abyss. Appellant asks this Court to interpret §1981 through the lens of those who drafted and enacted the statute into law understood "race."

Appellant has argued that the Supreme Court made clear that §1981 must be interpreted through the scope of the racial classifications as recognized by its drafters in the nineteenth century. *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 610-13 (1987). Under *Saint Francis College*, the relevant question is not how twentieth century, or even twenty-first-century social science distinguishes between religion, ethnicity, and race, but how the nineteenth-century drafters understood religion, race, and ethnicity. *See id*.

It is apparent from the Supreme Court opinions in *Saint Francis College*, the legislative history, as well as social science that Appellant attempted to introduce through expert witness testimony at the trial-court level, that Jews were considered a separate race by the nineteenth-century drafters of §1981. However, the drafters of

6

§1981 make no meaningful distinction between ethnic Jews and religious Jews, as none was understood at that time. *See* 42 U.S.C. §1981. The term "ethnicity," was not a part of any widespread vocabulary until at least the 1920s, more than a half century after §1981 was enacted into law. Michael Banton*, Max Weber on 'Ethnic Communities': A Critique.* NATIONS AND NATIONALISM*,* 13: 19-35 (2007). https://doi.org/10.1111/j.1469-8129.2007.00271.x. And prior to the 1920s, the "sociology of religion" was not widely recognized. *See id*. Those that drafted and enacted §1981 into law would have no concept of bifurcating religion from race as Appellee maintains.

It follows then that removing religion from "race" as "race" applies to §1981 imports a meaning from the twentieth and twenty-first centuries to a law that those who drafted and enacted it did not understand and could not have understood. Again, Appellee claims that it discriminated against Appellant based on Appellant's religion and not his race, which belies the problem with how many courts, and Appellee, interpret §1981. Appellee claims that it did not know Appellant was ethnically Jewish, but this distinction is incoherent under §1981's framework. In the nineteenth century, "Jewish" was a unitary classification – simultaneously racial, religious, and ancestral. This is because the modern social-science subdivisions did not exist then as they do now. The modern bifurcation of Jews into ethnic and/or religious subcategories was alien to the drafters of §1981. If §1981 protects individuals

against racial discrimination as "race" was understood in the nineteenth century, then the modern bifurcation between an ethnic and religious Jew defeats the intent of those that drafted and enacted §1981 into law.

The problem with *Saint Francis College*, and its progeny, is its misinterpretation of nineteenth century social constructs. The opinion in *Saint Francis College* states specifically that "[a]lthough §1981 does not itself use the word 'race,' the Court has construed the section to forbid all 'racial' discrimination of private as well as public contracts." *Id.* (citing *Runyon v. McCrary*, 427 U.S. at 160, 168, 174-175 (1976)). The *Saint Francis College* Court further delves into historical classification of different ethnic groups that it held were protected from discrimination under the statute, such as Jewish Americans, German Americans, Chinese Americans, and Mexican Americans, to cite only a few. *See id.* What the *Saint Francis College* Court misses is that the wording in §1981 specifically protects all persons to enjoy the same protection in making and enforcing contracts as "white" citizens. *See id.*; *See* 42 U.S.C. §1981. The drafters, in passing §1981, also sought to protect German Americans, Scandinavian Americans, and Anglo-Saxon Americans, as an example of the many groups discussed in the legislative history. *See Saint Francis College*, 481 U.S. at 613.

This analysis begs the question: why were German Americans, Scandinavian Americans, and Anglo-Saxon Americans not considered "white" by the drafters?

8

Why did these groups of people need the protections of §1981? Appellant argues that the legislative history is important as it illustrates the scope of "race" as it was understood by the drafters. Who twenty-first century Americans would classify as "white" is not the same group that the drafters classified as "white." Nineteenth century German Americans, Scandinavian Americans, and Anglo-Saxon Americans certainly had *white skin*, so why were the drafters seeking to afford them the same protections under §1981 as Jewish Americans, Arab Americans, and Chinese Americans? The drafters must have included religion and customs into their conception of "race," otherwise none of the dialogue at the time of passing §1981 makes sense. This supports Appellant's contention that "race" as it was understood to the drafters must have included religion, as there was little else, if anything at all, that could differentiate between German Americans, Scandinavian Americans, and Anglo-Saxon Americans in the nineteenth century. They were all "white" by modern standards.

Further, the opinion in *Saint Francis College* does not limit §1981 to the social constructs of the twentieth century in holding that "§1981, '**at a minimum**,' reaches discrimination against an individual 'because he or she is genetically part of an ethnically and physiognomically distinctive sub-grouping of homo sapiens.'" *Id.* (emphasis added). Accordingly, even the *Saint Francis College* Court does not limit

§1981's application only to members of "physiognomically distinctive sub-grouping of homo sapiens." *See id*.

Appellee bolsters its argument by asserting that it has accepted franchisees who are "ethnically Jewish yet Christian by faith." ROA 429. This admission does nothing to resolve the issue. This admission deepens it. The fact that Appellee tracks and identifies who is ethnically Jewish among their ranks and who is not demonstrates that Appellee understands "Jewishness" to be a stable ancestral category independent of religious practice. But this is not accurate. This allows Appellee to cloak its discrimination against the majority of Jews (who are presumably ethnically and religiously Jewish from a twenty-first-century scope) by admitting a token few ethnic Jews who are converted Christians into its ranks.

Appellee admits that it denied Appellant a franchise opportunity based on Appellant's Jewish faith. Appellee did not deny Appellant the opportunity based on Appellant's credit, capital, or business acumen. Appellee used Appellant's religion, a religion that is almost exclusive to his "ethnicity", as Appellee's stated, facially "neutral" justification, to discriminate against Appellant. Simply put, Appellee cited Appellant's faith to discriminate against Appellant based on Appellant's ethnicity, which is a distinction that the drafters of §1981 did not recognize or comprehend.

Appellee's First Amendment arguments and ministerial-exception arguments fail to justify Appellee's discrimination. The freedom of association that the First

Amendment protects does not extend to automotive repair services sold to the general public through commercial franchise agreements. The expressive association doctrine, as articulated in *Boy Scouts v. Dale*, protects groups whose membership choices are integral to their expressive mission. 530 U.S. 640 (2000). This is most certainly not that. A franchise agreement governing brake-pad replacement and tire rotations, among other services, cannot be "that."

The ministerial exception presents an even higher bar, as it requires that the individual perform functions going to the core of a religious organization's spiritual mission. *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171 (2012). Again, Appellee runs a chain of automotive repair and service shops. Changing tires and brake pads, among other secular services, cannot possibly be central to a religious organization's spiritual mission under any serious analysis. The First Amendment and the ministerial exception simply cannot transform every faith-motivated business decision into a constitutional shield against federal civil rights law.

As Appellant has argued, and maintains, §1981 must be interpreted through the lens of those that drafted and enacted the law. Those that drafted and enacted §1981 intended the law to protect individuals from racial discrimination as it was understood at that time, in the nineteenth century, not how it was understood in 1987 or now in 2026. The law is either static or fluid. If modern conceptions and constructs

by themselves can change the law, then it is pointless to amend laws or pass new laws. For these reasons, Appellant asks this Court to reverse and remand.

## IV. CONCLUSION

Appellant asks this Court to find, as a matter of law, that there is no meaningful distinction between Appellant's Jewish ethnicity and Jewish faith under 42 U.S.C. §1981 and to reverse and remand the district court's summary judgment award to Appellee. Appellant further prays for any other relief that this Court deems just and proper at law and in equity.

Respectfully submitted:

/s/ Eric L. Grogan
Eric L. Grogan
Attorney in Charge
Texas Bar No. 24116461
SD Bar No. 3510118
GROGAN LAW, PLLC
7600 Chevy Chase Dr.
Suite 300
Austin, TX 78752
eric@groganfirm.com
512-534-7970
**Attorney for Appellant Evan Domanic**

12

## CERTIFICATE OF COMPLIANCE

I hereby certify that in accordance with the Briefing Requirements in FED. R. APP. P. 32(a)(7)(B)(ii), this document contains 1,669 words as determined by Microsoft Word, which is the software used to generate the document. This word count does not include words contained in the sections of this motion excluded from the word limit by FED R. APP. P. 32(f).

> */s/ Eric L. Grogan*
> Eric L. Grogan

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2026, Appellant's Reply Brief was electronically filed with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all known counsel of record.

> */s/ Eric L. Grogan*
> Eric L. Grogan